143 N.J. Super. 580 (1976)
364 A.2d 32
WALTER H. ZYCK, PLAINTIFF,
v.
HARTFORD INSURANCE GROUP, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided August 10, 1976.
*584 Mr. John R. Lanza for plaintiff (Messrs. Winget & Keating, attorneys).
Mr. Arthur G. D'Alessandro for Defendant.
BEETEL, J.C.C., Temporarily Assigned.
This is an action which raises issues of first impression under the New Jersey *585 Automobile Reparations Reform ("No Fault") Act, N.J.S.A. 39:6A-1 et seq. On May 21, 1975 plaintiff filed suit seeking to recover additional income continuation benefits under his automobile insurance contract with defendant carrier. Thereafter he amended his complaint to include a claim that basic personal injury protection (PIP) benefits had been wrongfully terminated. After plaintiff's motion for partial summary judgment was denied without prejudice, the case was heard by this court, sitting without jury.
On October 10, 1974 plaintiff sustained personal injuries when the automobile he was driving was struck by another vehicle. At the time of this accident plaintiff, a New Jersey resident, carried automobile insurance with defendant. His policy afforded him the standard PIP benefits mandated by N.J.S.A. 39:6A-4 and also provided additional income benefits up to $400 a week (and a maximum total of $41,600) pursuant to N.J.S.A. 39:6A-10.
As a result of this accident plaintiff was immediately hospitalized and examined by Dr. Melvin P. Vigman, a neurosurgeon. He was subsequently examined by Dr. C.N. Stover, an orthopedic surgeon. Based upon their examination and a series of medical tests, plaintiff's condition was diagnosed as an acute traumatic and chronic muscle strain syndrome, a hyperextension injury to the neck. Plaintiff remained in the hospital until November 8, 1974 but was readmitted for further treatment from June 23 to July 10, 1975.
At the time of the accident plaintiff was employed as a feed salesman by the Flory Milling Company at an average gross salary of $128.05 a week.[1] In addition to this job *586 plaintiff and his wife ran a real estate business under the trade name of Diamond Realty. Plaintiff's wife had a real estate broker's license and plaintiff acted as the business' primary salesman. The trial testimony indicated that the wife's contribution to this business was minimal; she acted as the "front person" while plaintiff ran the business and generated substantially all of the sales. Plaintiff's joint tax returns for 1973 and 1974 disclosed the following:

 1973 1974
Gross receipts from business ........ $19,560.00 $11,180.00
Business expenses ................... 14,270.81 8,810.40
Net business profit ................. 5,289.19 2,369.60
Wages from Flory Milling ............ 6,388.74 5,520.00

The gross receipts of this business represented commissions paid to plaintiff for selling real estate which he deposited into Diamond Realty's business account. After his accident no sales were made until plaintiff returned to work in September 1975.
Defendant carrier acknowledged liability under its policy but disputed the amount of incomes subject to protection. It paid plaintiff $3,435.39 in benefits over a 41-week period, crediting plaintiff with $21.82 a week of income attributable to his business.[2] On July 24, 1975 defendant engaged Dr. *587 William J. Moore, a general surgeon specializing in abdominal surgery, to examine plaintiff. Based upon this single examination and Dr. Moore's recommendation that plaintiff was competent to perform his duties, defendant terminated all benefits effective the day of this examination. Plaintiff did not return to his own two jobs until September 11, 1975.
Although this action raises several previously unresolved legal issues, two factual issues should be resolved at the outset.
Plaintiff claims that defendant terminated his insurance benefits prior to the time he was physically able to return to work. In support of this claim two of his treating physicians, Drs. Vigman and Stover, testified at trial. Both of these specialists agreed that plaintiff was not sufficiently recovered from his injuries to return to work on July 24, 1975 (a mere two weeks since his last discharge from the hospital). Defendant presented the testimony of Dr. Moore, who examined plaintiff only once and for the sole purpose of ascertaining whether the carrier should continue paying under its policy. Dr. Moore candidly admitted that he did not inquire into plaintiff's prior work habits (which involved substantial time traveling in his automobile) and that he was not a specialist in neck injuries.
This court finds that the opinions of the treating specialists are more credible than that of the carrier's physician. These specialists were thoroughly familiar with plaintiff's injuries and his work habits, hence their opinions should prevail. Therefore, plaintiff is entitled to an additional seven weeks of benefits.
The second factual issue concerns the nature of plaintiff's real estate business and his relationship thereto. The law of damages draws a crucial distinction between a business enterprise generating profits primarily from the personal endeavors, skill and attention of the owner and a business *588 enterprise generating profits from the investment of capital or from the labor of others. Annotation, "Profits of Business as Factor in Determining Loss of Earnings or Earning Capacity in Action for Personal Injury or Death," 45 A.L.R.3d 345, § 2(b) at 353; Restatement, Torts, § 924. The courts of our State have implicitly recognized this distinction. See Woschenko v. C. Schmidt & Sons, 2 N.J. 269, 278 (1949); New Jersey Express Co. v. Nichols, 33 N.J.L. 434 (E. & A. 1867).
Plaintiff's proofs show that he was the main contributor to Diamond Realty. He alone met with the clients, negotiated contracts and attended title closings. Contacts made by him with farmers through his feed sales provided opportunities to advance his real estate business. On occasion other salesmen were utilized, but their commissions offset any real profit to the business. Plaintiff's wife held the broker's license but she contributed little else to the business. Overhead consisted of a small office and its furnishings. The business generated only modest profits and when plaintiff was incapacitated no sales were made. This court is satisfied that plaintiff was responsible for 98.5% of all profit generated by this business,[3] and that his personal endeavors, skill and attention predominated to the exclusion of any return on capital or the labor of others.
The crux of this action concerns the definition and method of computing "income" within the meaning of the New Jersey Automobile Reparation Reform Act. N.J.S.A. 39:6A-2(c) provides that "`Income' means salary, wages, tips, commissions, fees and other earnings derived from work or employment." This definition is incorporated into the other pertinent sections of the act, N.J.S.A. 39:6A-4(b) (income continuation benefits) and N.J.S.A. 39:6A-10 (additional personal injury protection coverage)
*589 Left unresolved by this statutory language is whether the insured is entitled to his "gross income" or his "net income," and if entitled to "gross income," what elements should be included therein. In order to decide these questions it is the function of this court to ascertain the intention of the Legislature, Safeway Trails, Inc. v. Furman, 41 N.J. 467 (1964), while giving due effect to the statutory language employed, Lehmann v. Kanane, 88 N.J. Super. 262 (App. Div. 1965), and the history of the particular enactment, Matawan v. Monmouth County Bd. of Tax., 51 N.J. 291 (1968).
As an abstract proposition it seems clear that the Legislature intended that the beneficiary of no fault coverage receive compensation for lost "gross income" rather than lost "net income." In its December 1971 report, "Reparation Reform for New Jersey Motorists", the New Jersey Automobile Insurance Study Commission stated:
As to disability benefits for loss of income, the Commission has not adopted the generally followed practice of reducing the lost income compensation to reflect an average income saving of 15%. Such reduction is contrary to the facts of life. The low income earner with a family would be penalized, while the high income earner would enjoy a windfall since his after tax income is less than 85% of gross. The Commission also recommends keying the basic benefits and the corresponding basic rates to the low income earner with a provision that each insured will have available a lost income benefit commensurate with the actual income he wants to protect * * *. [at 62A]
Mario A. Iavacoli, legal counsel to the Commission and a principal draftsman of the recommended legislation, states in his treatise, No Fault and Comparative Negligence in New Jersey, § 18 (1973), that the income loss protected by N.J.S.A. 37:6A-4(b) and 39:6A-10 should be determined by the gross loss of such income without reduction for federal or state taxes, union dues or Social Security taxes. Additionally, it appears that in providing 75% income protection for weekly earnings over $100, N.J.S.A. 39:6A-10, the *590 Legislature was attempting to reflect the income tax saving windfall to higher wage earners (no fault benefits are not subject to taxation), and thus implicitly recognized that gross income was to be the measure of recovery. Lastly, in common law tort actions, gross earnings unreduced by payroll deductions are a standard upon which a jury is to determine loss of earnings or impairment of earning capacity. Hoge v. Anderson, 200 Va. 364, 106 S.E.2d 121 (Sup. Ct. App. 1958); cf. Moore v. Public Service Coord. Transport, 15 N.J. Super. 499 (App. Div. 1951). Therefore, this court holds that the income protected by N.J.S.A. 39:6A-4(b) and 39:6A-10 must not be reduced by federal income taxes, state income taxes, Social Security taxes, self-employment taxes, state unemployment insurance payroll deductions, union dues, and other similar deductions or taxes.
Neither party to this action seriously disputes this conclusion, but they do differ as to the meaning of "gross income" for a self-employed individual. Plaintiff contends that his income from Diamond Realty should be measured by his "gross commissions" unreduced by business expenses. Defendant contends that, at best, plaintiff is entitled to one-half of the net profits of this business and probably less because some of these profits are attributable to the return on a capital investment. A subsidiary issue involves the method and the standards to be employed by the insurance industry in determining a self-employed assured's income. In order to resolve these issues it seems appropriate to examine some of the purposes of the No Fault Act, discuss the analogous area of common law tort damages, and finally turn to the pertinent statutory language.
Among the many purposes of the Automobile Reparations Reform Act, two guiding principles are particularly pertinent to the issues raised here. The first principle is efficiency. From the standpoint of the assured, this means "prompt payment of * * * lost wages * * * without having to await the outcome of protracted litigation," Harris v. Osorio, 125 N.J. Super. 468, 469 supplementing 125 N.J. *591 Super. 463 (Law Div. 1973); and from the standpoint of the insurer, this means "the avoidance of the high investigative and administrative costs of handling * * * claims," Rybeck v. Rybeck, 141 N.J. Super. 481, 496 (Law Div. 1976). As our Appellate Division has said:
The major concern of the PIP provision of the No Fault Legislation was to provide an efficient and inexpensive method by which persons injured in automobile accidents would be reimbursed for out of pocket expenses. [Pennsylvania Mfrs. Ass'n Ins. Co. v. GEICO, 136 N.J. Super. 491, 499 (App. Div. 1975)]
This principle is further illustrated by the legislative mandate of payment within 30 days, N.J.S.A. 39:6A-5, and reduction of premium rates, N.J.S.A. 39:6A-18.
The second guiding principle is the need for an economic redistribution of the premium dollar. By eliminating the criteria of the absence of fault as a precondition to recovery and by making compensation available to all motorists in our State on a first party basis, the Legislature greatly expanded the number of people entitled to share in the pool of premium dollars. Contrawise, the Legislature reduced the total premium pool by mandating a reduction in insurance rates. Succinctly stated, "Many more people sharing less money * * * require[s] each of them to receive substantially smaller amounts." Rybeck v. Rybeck, supra at 490. The total liability of this premium pool has been reduced to some extent. The Legislature envisioned a reduction of litigation expenses. Emma v. Romano, 136 N.J. Super. 255, 260 (Law Div. 1975). Some double coverage from collateral sources has been terminated. N.J.S.A. 39:6A-6. Recovery for pain and suffering has been curtailed. N.J.S.A. 39:6A-8. "[T]he elimination of the cumbersome and uneconomic shifting of dollars from one insurance company to another," Pennsylvania Mfrs. Ass'n Ins. Co. v. GEICO, supra, 136 N.J. Super. at 499, by the prohibition against subrogation, N.J.S.A. 39:6A-9, has also helped to reduce costs. Nothwithstanding *592 these measures, insurance costs under no fault continue to rise. Thus, in making any determination regarding recovery by an individual assured a court should be mindful of the economic consequences involved and should strive to permit recovery of only out of pocket expenses, no more, no less. "The concern of the No Fault statute was to eliminate reliance upon arbitrary formulas applying or encouraging multiples of damages." Pitti v. Astegher, 133 N.J. Super. 145, 149 (Law Div. 1975).
Iavacoli, in his treatise on the No Fault Act, supra, states:
Determining the amount of lost income of one who is self-employed has often proved to be difficult. The Act has in no way affected such determinations; the concepts presently utilized in tort actions apply with equal force under the provisions of the Act. [§ 18, at 54]
Unfortunately, and with due regard to this learned writer, Iavacoli is only half right. The determination of the earnings of a self-employed individual is a difficult task, Bach v. Giordano, 144 Conn. 183, 128 A.2d 323 (Sup. Ct. Err. 1956); however, tort damage concepts cannot be applied with equal force under the No Fault Act. At common law there is a distinction between loss of earnings occurring before trial, Ellis v. Robinson, 7 N.J. Misc. 470, 145 A. 870 (Sup. Ct. 1929), and the prospective loss of earning capacity, Coll v. Sherry, 29 N.J. 166 (1959). Although not generally articulated, the loss of earnings before trial is merely a part of the recoverable element of lost time, lost wages being merely evidential of the value of a party's lost time. 22 Am. Jur.2d, Damages, § 89; Smith v. Red Top Taxicab Corp., 111 N.J.L. 439 (E. & A. 1933); Alexander v. Cheaster, 110 N.J.L. 95 (E. & A. 1932). Under the No Fault Act, however, lost earnings are compensable as such. Therefore, although the common law of damages deals with analogous concepts, it is not necessarily determinative regarding recovery under the No Fault Act.
*593 Returning to the issue of the meaning of income for a self-employed assured, the pertinent statutory language defines "income" as "salary, wages, tips, commissions, fees, and other earnings from work or employment." N.J.S.A. 39:6A-2(c) (emphasis supplied). This is amplified somewhat by N.J.S.A. 39:6A-4(b) which requires payment of income continuation benefits for "loss of income of an income producer" (emphasis supplied). "Income producer" is defined to mean "a person, who at the time of the accident causing personal injury or death, was in an occupational status, earning or producing income." N.J.S.A. 39:6A-2(d). It appears beyond contravention that a self-employed individual is not excluded from the act's coverage. An "occupation * * * embrace[s] all gainful activities, professional or business, and whether pursued as an employee or self-employer." Jantausch v. Verona, 41 N.J. Super. 89, 97-98 (Law Div. 1956). The primary criterion for coverage is not who the employer is (whether one's self or another), but whether the employee generates or produces income from his own labor or work. Hence, certain kinds of income are excluded from the act's coverage. This includes income generated from capital investments, income produced by the work of others, inheritances, gifts and the like.
In the factual context of this case this court has found as fact that plaintiff was responsible for the production of substantially all of the profts generated by Diamond Realty. There was no profitable monetary return on his capital investment since the investment was relatively insubstantial and merely incidental to the services rendered.
The question remains, then, whether such profits can be equated with income. In the factual context of this case, the answer is yes. Where the profits are generated exclusively through the labor of the assured without substantial assistance by others, and where the capital investment is either insignificant or incidental to the services rendered by the assured, profits may be equated with "income" within the meaning *594 of the No Fault Act.[4] See Sparling v. Hoard, 380 S.W.2d 940, 12 A.L.R.3d 1341, 1345 (Mo. App. 1964); New Jersey Express Co. v. Nichols, 33 N.J.L. 434 (E. & A. 1867).
This conclusion is buttressed by the fact that business profits of this nature are reported as personal income under the Internal Revenue Act. The assured is thus provided with an expeditious means of proving his lost income and is also able to determine in advance the amount of income that will be protected by his no fault coverage. The insurer also benefits since it may make an intelligent decision regarding such claims within a short period of time and without the necessity of extensive investigation. This rule is thus in accord with the guiding principle of efficiency implicit in a workable No Fault scheme. Further, because this rule provides no greater recovery than that available at common law, the principle of economic redistribution has not been violated.
*595 A final argument must be disposed of. Plaintiff argues that 98.5% of the $30,740 denominated on his income tax returns for 1973 and 1974 (representing 93 weeks of business activity) as "gross receipts" actually represents "commissions" earned by him and reinvested in the business. He argues that "commissions" are expressly included within the definition of "income" under N.J.S.A. 39:6A-2(c), and that if he were not self-employed, such commissions would not be reduced by the amount of money he invested in business ventures. However true this assertion is, plaintiff is playing a game of semantics. Under the common law of damages, lost earnings attributable to lost commissions must be reduced by expenses incurred in earning these commissions before being admissable to prove the value of lost time. Diamond Rubber Co. v. Harryman, 41 Colo. 415, 92 P. 922 (Sup. Ct. 1907). Recovery under No Fault should not exceed recovery at common law absent an indication by the Legislature to the contrary. Further, plaintiff's "commissions" from his real estate sales formed the "gross receipts" of the business. "[G]ross receipts of a plaintiff's business are no index to either net earnings or earning power." Rodgers v. Yellow Cab Co., 395 Pa. 412, 147 A.2d 611, 619 (Sup. Ct. 1959). No Fault is designed to protect an individual's out-of-pocket losses, not the losses of a business. Under the rule of this case, plaintiff is being compensated for his lost profits and they truly represent the value of his services to himself.
One final issue remains: Upon what evidence should an insurance company (and ultimately a court) base its determination of the amount of income compensable under PIP? N.J.S.A. 39:6A-5 permits an insurer to require its assureds to furnish "written notice of the fact of a covered loss and of the amount of same." This section also permits an insurer to deny coverage upon "reasonable proof that the insurer is not responsible for payment." N.J.S.A. 39:6A-13(a) provides that
Every employer shall, if a request is made by an insurer * * *, furnish forthwith, in a form approved by the Commissioner of Insurance, *596 a signed statement of the lost earnings since the date of the bodily injury and for a reasonable period before the injury, of the person upon whose injury the claim is based. [Emphasis supplied]
Defendant presented testimony regarding standard industry practices. This indicated that insurance companies ordinarily require a statement reporting earnings for a period of 12 months before the injury. Also it is standard practice to require more proof from self-employed assureds since their dual role as employer and employee raises some doubt concerning the accuracy of their reports. These practices appear unobjectionable and, if these or other practices become oppressive in a particular case, an assured is permitted to petition a court for a summary disposition of his complaint. N.J.S.A. 39:6A-13(g).
Here, plaintiff's proofs consisted of his income tax returns, for a period slightly more than 21 months prior to his injury, supplemented by oral testimony. Plaintiff does not employ a full-time accountant and the primary medium for his recordkeeping is his federal income tax return. Although the 21-month period used here to evidence lost earnings exceeds the insurer's practice of using a 12 month base, in the context of this case it suffices to provide a reasonable basis to calculate his lost earnings and indeed provides the most competent evidence available. Thus, this court will use plaintiff's tax returns for the 93 weeks prior to his injury to calculate his lost earnings. However, where more detailed financial statements are reasonably available to a self-employed assured, an insurer would not ordinarily be unjustified in requesting them.
For the reasons stated above, this court finds in favor of plaintiff in the amount of $2,739.91 plus taxed costs. This amount includes interest of $85.32 on the seven weeks of benefits wrongfully withheld  10% on the $713.16 of no fault benefits, N.J.S.A. 39:6A-5(c), and 8% on the $175.00 for disability benefits which do not come within the No Fault Act. This court finds that, because defendant had *597 "reasonable proof" that it was not liable for all of plaintiff's business income, underpayments of additional income benefits for the 41 week period ($3,357.08 less $1,590.39) are not "overdue" within the meaning of N.J.S.A. 39:6A-5(b) and thus will not be subject to the 10% interest provision of N.J.S.A. 39:6A-5(c). Because of the novel questions of law involved and defendant's lack of bad faith, taxed costs shall not include an award of counsel fees. R. 4:42-9(a) (6); Felicetta v. Commercial Union Ins. Co., 117 N.J. Super. 524 (App. Div. 1971). The calculations upon which this decision is based will be found in the Appendix to this opinion.

*598 APPENDIX:

SCHEDULE A: Evidence of Income and Expenses.

 1973 1974
 (52 Weeks) (41 Weeks)
"Gross receipts" Diamond Realty $19,560.00 $11,180.00
Plaintiff's "gross commissions" $19,100.00 11,180.00
Other "gross commissions" 460.00 0.00
"Business expenses" of Diamond Realty 14,270.81 8,810.40
Diamond Realty's "net profit" 5,289.19 2,369.60
"Net profit" attributable to plaintiff[**] _______ _______
Wages from Flory Milling 6,388.74 5,520.00
 (Last 11 (First 41
 weeks) weeks)
Wages from Flory Milling (for the 52 weeks
 preceeding plaintiff's accident) 1,234.80 5,520.00
 Total Average
 (93 Weeks) Per Week
"Gross receipts" Diamond Realty $30,740.00 $330.54
Plaintiff's "gross commissions" 30,280.00 325.59
Other "gross commissions" 460.00 4.95
"Business expenses" of Diamond Realty 23,081.21 248.18
Diamond Realty's "net profit" 7,658.79 82.35
"Net profit" attributable to plaintiff[**] 7,543.91 81.12
Wages from Flory Milling 11,908.74 128.05
 (52 weeks)
Wages from Flory Milling (for the 52 weeks
 preceeding plaintiff's accident) 6,754.80 129.90

SCHEDULE B: Benefits Paid by Defendant over 41-week Period.

Income from Flory Milling ($6,754.80 divided by
 52 weeks ...................................... $129.90/week
Net profits from Diamond Realty for 1974 ($2,369.00)
 divided by 52 weeks X 50% (to reflect alleged
 equal partnership) ............................ $ 21.82/week
Total weekly income ............................................ $ 151.72
First $100/week of income subject to basic income
 protection, less $80.00/week payable under
 workers' compensation = $20.00/week X 41 weeks ............. $ 820.00
Next $51.72/week of income subject to 75% coverage
 under additional income protection
 = $38.79/week X 41 weeks ................................... $ 1,590.39
Temporary disability benefits of $25.00/week X
 41 weeks ................................................... $ 1,025.00
Total benefits paid: $3,435.39

*599 SCHEDULE C: Plaintiff's Demand (48 weeks of benefits).

Income from Flory Milling ($11,908.74 divided
 by 93 weeks) .................................. $128.05/week
Gross commissions from Diamond Realty ($30,280.00
 divided by 93 weeks) .......................... $325.59/week
Total weekly income ............................................ $ 453.64
First $100/week of income subject to basic income
 protection, less $80.00/week payable under
 workers' compensation = $20.00/week X 48 weeks ............. $ 960.00
Next $353.64/week of Income subject to 75%
 coverage under additional income protection
 = $265.23/week X 48 weeks .................................. $12,731.04
Temporary disability benefits of $25.00/week X 48 weeks ........ $ 1,200.00
Total benefits payable ................... $14,891.04
 Less benefits paid ................... 3,435.65
 __________
Total Due ................................ $11,455.65
 Plus 10% interest on $11,280.65
 (unpaid No Fault benefits) ........... 1,128.06
 Plus 8% interest on $175.00 (unpaid
 disability benefits) ................. 14.00
 __________
Total Demand ............................. $12,597.71 plus costs and
 counsel fees

SCHEDULE D: Court's Solution (48 weeks of Benefits).

Income from Flory Milling ($11,908.74 divided
 by 93 weeks) .................................. $128.05/week
Net profit from Diamond Realty attributable to
 plaintiff ($7,543.91 divided by 93 weeks) ..... $ 81.12/week
Total weekly income ............................................ $ 209.17
First $100/week of income subject to basic income protection,
 less $80.00/week payable under workers' compensation
 = $20.00/week X 48 weeks ................................... $ 960.00
Next $109.17/week of income subject to 75% coverage under
 additional income protection = $81.88/week X 48 weeks ...... $ 3,930.24
Temporary disability benefits of $25.00/week X 48 weeks ........ $ 1,200.00
Total benefits payable ................ $6,090.24
 Less benefits paid ................ 3,435.65
 _________
Total Due ............................. $2,654.59
 Plus interest (Schedule E) ........ 85.32
 _________
Total award ........................... $2,739.91 plus taxed costs

*600
 41 Weeks 7 Weeks 48 Weeks Interest
Basic income protection benefits
 Payable $ 820.00 $140.00 $ 960.00
 Paid 820.00 0.00 820.00
 Unpaid 0.00 140.00 140.00
Additional income protection
 benefits
 Payable 3,357.08 573.16 3,930.24
 Paid 1,590.39 0.00 1,590.39
 Unpaid 1,766.69 573.16 2,339.85
Total No Fault benefits
 Payable 4,177.08 713.16 4,890.24
 Paid 2,410.39 0.00 2,410.39
 Unpaid 1,766.69 713.16 2,479.85
$713.16 is "overdue" under N.J.S.A.
 39:6A-5(b) and is thus subject
 to 10% interest $71.32
Disability benefits
 Payable 1,025.00 175.00 1,200.00
 Paid 1,025.00 0.00 1,025.00
 Unpaid 0.00 175.00 175.00
$175.00 is to be subjected to 8%
 interest under R. 4:42-11(a) 14.00
 ______
 $85.32

NOTES
[1] This figure is based upon the 93-week period reflected in plaintiff's 1973 and 1974 federal income tax returns. Defendant used wage stubs from the 52 weeks preceding the accident and calculated an average gross weekly income of $129.90 a week. For reasons of consistency, this court will use the 93-week base period to calculate all income claims.
[2] Defendant calculated this income by reducing the 1974 net business profit by 50% (to reflect a presumed equal partnership between plaintiff and his wife) and dividing this total by 52 weeks (this despite the fact that the business only produced profits during the first 41 weeks of 1974). In addition to the standard PIP benefits and additional income benefits due plaintiff under his policy, he was also undisputedly entitled to a payment of $25 a week as permanent disability benefits. The amount due was, however, subject to a reduction of $80 a week which represented plaintiff's entitlement under worker's compensation. N.J.S.A. 39:6A-6. Defendant paid plaintiff 41 weeks of benefits  $20 for basic income benefits, $25 for permanent disability, and $38.79 as additional income benefits. This latter amount represents 75% of weekly income over $100, and thus $22.43 (75% of $29.90) was attributable to plaintiff's salary from Flory Milling and $16.36 (75% of $21.82) to his income from Diamond Realty.
[3] Of the $30,740 in net receipts Diamond Realty received during the 93-week period in evidence, $30,280 was attributable to plaintiff's sales.
[4] A much more difficult problem is presented where the assured is involved in other types of business enterprises and receives compensation other than via a salary or wage. The common law tort rule in our State provides that the measure of earning capacity is "the value of the plaintiff's services in the business." Woschenko v. C. Schmidt & Sons, 2 N.J. 269, 278 (1949). Given this rather nebulous standard, it seem extremely difficult for an insurer to fairly decide how to compensate a person for lost income within 30 days. Perhaps this is an area where the Commissioner of Insurance could profitably exercise his rule-making powers under N.J.S.A. 39:6A-19.

This case also illustrates a deficiency in the No Fault Act which would seem to require further legislation. Because of the calendar congestion caused by giving priority to criminal cases and other administrative problems inherent in our present court system, plaintiff's claim was not heard for more than one year. Had he or the insured demanded a jury trial, the delay would have been two to three times longer. Thus a judicial remedy is inappropriate if the mandate of prompt first-party payment for lost earnings is to be achieved. It is humbly suggested that some form of arbitration panel be made available so that good faith disputes, like this, can be resolved with dispatch.
[**] Plaintiff generated 98.5% of the gross receipts of Diamond Realty over this 93-week period. Thus, 98.5% of the net profit from this business is attributable to plaintiff.