227 N.J. Super. 367 (1988)
547 A.2d 710
TINA OLIVERO, BY HER PARENTS AND GUARDIAN AD LITEM, MARGARET OLIVERO, AND MARGARET OLIVERO, INDIVIDUALLY, PLAINTIFF-APPELLANT,
v.
NEW JERSEY MANUFACTURERS INSURANCE COMPANY, DEFENDANT-RESPONDENT, AND LIBERTY MUTUAL INSURANCE COMPANY, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 1987.
Decided August 12, 1988.
*369 Before Judges DEIGHAN and LANDAU.
Darrell Fineman argued the cause for appellant (Capizola, Fineman & Kutner, P.A., attorneys; Barbara Lapham on the brief; Fineman on the reply letter brief).
J. Robert McGroarty argued the cause for respondent (McGroarty & Killen, P.C., attorneys; J. Robert McGroarty on the brief).
The opinion of the court was delivered by DEIGHAN, J.A.D.
On this appeal we are required to determine whether a claimant who has received temporary disability benefits under the Workers' Compensation Act, N.J.S.A. 34:15-1 et seq. for 340 weeks, is entitled to income continuation benefits under N.J.S.A. 39:6A-4 and 10 of the New Jersey Automobile Reparation Reform Act (No-Fault), N.J.S.A. 39:6A-1 et seq., after termination of the workers' compensation benefits. We hold that where temporary disability benefits under workers' compensation are paid in excess of income disability payments under No-Fault but the disability continues beyond the period of the workers' compensation benefits, a claimant is entitled to receive income continuation benefits under the No-Fault Act as long as *370 the disability persists up to the maximum income continuation benefits under the policy less a credit under N.J.S.A. 39:6A-6 for the workers' compensation benefits paid.
This is an action for a declaratory judgment by plaintiffs to determine personal injury protection benefits (PIP) coverage pursuant to the New Jersey Automobile Reparation Reform Act (No-Fault), N.J.S.A. 39:6A-1 et seq., under an automobile insurance policy issued by defendant New Jersey Manufacturer's Insurance Company (NJM) to plaintiff Margaret Olivero. On a previous appeal we reversed a dismissal of the complaint and remanded for a determination as to whether income continuation benefits were payable to Mrs. Olivero's daughter, Tina, pursuant to N.J.S.A. 39:6A-4 and 39:6A-10. Olivero v. New Jersey Manufacturers Ins. Co., 199 N.J. Super. 191 (1985). After remand, plaintiffs filed an amended complaint to reform the insurance policy to provide for income continuation benefits for as long as plaintiff's disability continued. See Clendaniel v. New Jersey Manufacturers Insurance Company, 96 N.J. 361 (1984). See also Lumbermens Mutual Casualty Co. v. Carriere, 170 N.J. Super. 437 (Law Div. 1979).
Plaintiffs appeal from an order entered April 1, 1987[1] which granted defendant's motion for summary judgment dismissing plaintiffs' complaint. The order also denied plaintiffs' motion for partial summary judgment to determine and adjudge that Tina Olivero is entitled to income continuation benefits under N.J.S.A. 39:6A-10 for as long as her disability exists and further to reconstruct her wage losses for impairment of earning capacity.
The basic facts underlying plaintiffs' claim are essentially undisputed. On April 21, 1981, plaintiff Tina, then 12 years of age, was seriously injured when she was struck by an automobile while riding her bicycle and delivering papers for the *371 Vineland Times Journal. As a result of head injuries, she suffered from neurological deficiencies with ambulation, coordination and speech dysfunction. Her learning ability and memory retention have also been seriously impaired. Extensive surgery, treatment and therapy, designed to minimize the effects of the injury, have continued over the years since the accident to the present time.
On May 11, 1981, a workers' compensation petition was filed by Tina. On July 16, 1981, Liberty Mutual Ins. Co., the workers' compensation carrier for Vineland Times Journal, was directed to "supply to the petitioner all reasonable and necessary medical care necessary for her to recover from her injuries suffered on April 21, 1981." Liberty Mutual was also directed to pay the minimum temporary disability payments of $53.07 per week (Tina earned $29 per week for six and one-half hours work). As of July 17, 1984, Liberty Mutual paid a total of $157,356.58 for medical benefits as well as temporary disability benefits under workers' compensation which continued after that date.
Tina has been treated at the Children's Hospital of Philadelphia on several occasions. Medical doctors at Children's Hospital recommended home therapy and physical therapy requiring private tutoring, remodeling of plaintiffs' home and physical therapy at a health spa.
She has also been admitted on numerous occasions to Children's Seashore House in Atlantic City for surgery and rehabilitative treatment. In June 1984, Tina had surgery to correct the spastic condition of her toes and foot. During July and August 1984 she was an in-house patient at Children's Seashore House and received occupational and speech-language therapy. The discharge summaries from Children's Seashore House state that physical, occupational and speech therapy are to be continued at home and at the Newcomb Hospital in Vineland.
Although Tina is still severely disabled and handicapped, she was able to graduate from high school in 1986. She is now 18 *372 years of age and is a freshman at Cumberland County College. Her marks range between "B's" and "C's" and, after graduation, she intends to transfer to a four-year college. Although it has been six years since the automobile accident, Tina remains under the care of a doctor and continues to be severely disabled.
At the time of the accident, Tina resided with her mother, Margaret Olivero. When Mrs. Olivero initially applied for an insurance policy from NJM, she requested option 5 for additional income continuation benefits up to $36,400. The policy, which was renewed from year to year, was issued in February 1977 with coverage under option 5 and was in effect on the date of the accident.
On August 12, 1987, the Workers' Compensation Judge entered an order approving settlement which awarded Tina 340 weeks temporary disability at $53.07 per week for a total of $18,424.63[2] plus total permanent disability of 450 weeks at $124.88 per week for a total of $56,196 less $4,192.53 paid for a balance of $52,003.47. Permanent disability payments were made retroactive to January 13, 1986, thus allowing Liberty Mutual a credit for all temporary disability benefits paid to Tina after that date with "[p]ermanent disability to continue beyond 450 wks., as allowed by statute." The 100% of total was based on neurologic, orthopedic and psychiatric permanent disability.
The order also required that:
Respondent [Liberty Mutual] shall continue to authorize all medical treatment presently provided petitioner, including without limitation, all physicians presently treating petitioner out of Childrens' Hosp. in Philadelphia, Pa., Leona Glovsky, a speech therapist in Vineland, N.J., and such further reasonable and necessary treatment as may be recommended by these physicians.
NJM acknowledges that under option 5 of the policy, Tina is entitled to the maximum income continuation benefits up to *373 $41,600 which represents $5,200 as the basic benefits plus $36,400 for additional income continuation benefits.
On this appeal, plaintiffs raise the following issues: "[1] Defendant NJM's failure to offer the option to purchase additional PIP benefits provided by N.J.S.A. 39:6A-10 to cover plaintiff mandates that the policy be reformed to provide these benefits; [2] [p]laintiff is entitled to the payment of income continuation benefits from the date that she is declared permanently disabled by the Workers' Compensation Court, and [3] [p]laintiff was entitled to reconstruct and project the amount her wages would have been except for the injuries suffered in the automobile accident."

I
In their first issue, plaintiffs contend that "[a]t the time of the accident, the benefits provided in the insurance policy did not include the required section 10 [N.J.S.A. 39:6A-10] option for income continuation benefits for the length of the disability covering either the named insured and/or household relatives." (Emphasis supplied.) They contend that the failure to offer additional options requires that the policy be reformed to provide those benefits. See Clendaniel v. N.J. Manufacturers Ins. Co., supra. See also Lumbermens Mutual Casualty Co. v. Carriere, supra.
The basic personal injury protection (PIP) pursuant to N.J.S.A. 39:6A-4b provides:

b. Income continuation benefits. The payment of the loss of income of an income producer as a result of bodily injury disability, subject to a maximum weekly payment of $100.00, per week. Such sums shall be payable during the life of the injured person and shall be subject to an amount or limit of $5,200.00, on account of injury to any one person, in any one accident.
N.J.S.A. 39:6A-10[3] pertaining to additional PIP coverage at the time the policy was issued provided:

*374 Additional personal injury protection coverage.

Insurers shall make available to the named insured covered under section 4, suitable additional first-party coverage for income continuation benefits, essential services benefits, survivor benefits and funeral expense benefits. Income continuation in excess of that provided for in section 4 must be provided as an option by insurers to persons for disabilities, as long as the disability persists, up to an income level of $35,000.00 per year, with the excess between $5,200.00 and the amount of coverage contracted for to be written on the basis of 75% of said difference. The Commissioner of Insurance is hereby authorized and empowered to establish, by rule or regulations, the amounts and terms of income continuation insurance to be provided pursuant to this section. [Emphasis supplied.]
Under this section, the Commissioner of Insurance promulgated N.J.A.C. 11:3-7.3 pertaining to additional income continuation benefits as set forth in Appendix I annexed hereto.
In addition to the five options which insurance carriers were required to offer, the notes to the table under Appendix A of the regulation required that the insurance carriers inform their insureds that: "Broader forms of additional personal injury protection benefits are available on a `referred to company' basis." The Commissioner also notified insurance carriers that policyholders must be apprised of coverage available under the Act and promulgated a form letter for that purpose. See Lumbermens Mutual Casualty Co. v. Carriere, 170 N.J. Super. at 404. Insurers were not required to use the Commissioner's form letter, but to the extent that the insurer's form letter varied from the Commissioner's in substance, his approval was required. Id. at 444-45. The Commissioner suggested the following to be included in a notice or letter by the insurance carriers to their insureds:
As a part of each loss of income benefits there are included additional benefits for essential services and a $10,000 death benefit. Please refer to the enclosed `Offer to Purchase Additional Coverage' for further details of these options. If you desire coverage in excess of those quoted above, inquire directly of your [company] [agent].
*375 Richard Pazdan, an underwriter with NJM for 16 years, was deposed by plaintiffs. He stated that prospective insureds were sent a business package which contained an explanation of "Personal Injury Protection coverage" and also the availability of "Additional PIP Coverage". The notice itemized the five options for additional PIP coverage as set forth in Appendix I attached hereto. Above the schedule of the five options, the form contained the following:
ADDITIONAL PIP COVERAGE
Additional coverage for loss of income is available in blanket sum amounts of $5,200, $7,800, $13,000, $20,800 or $36,400 payable in specific weekly maximum, and applies per named insured (i.e., husband and wife).
Therefore, we are pleased to make available additional first-party "No Fault" coverages as outlined in five (5) options below. Broader forms of additional Personal Injury Protection benefits are available on request. [Emphasis supplied.]
Pazdan stated that the same type notice would have been sent to Mrs. Olivero for the renewal of her policy from February 1981 to February 1982.[4]
In addition, Pazdan testified that prior to December 1982, NJM did not offer an additional PIP endorsement as an option under N.J.S.A. 39:6A-10 to provide income continuation benefits "for so long as the disability existed." He testified that there was no provision in 1981 for rating this type of risk. In absence of a rating, the risk could not be offered to insureds. He also stated that the absence of a rating was not peculiar to NJM, but rather there was no such rating by the Commissioner available to the entire insurance industry.
*376 There is nothing in the record to refute Pazdan's testimony that no rates were available to offer to prospective insureds for additional income continuation benefits for "as long as the disability persists" prior to December 1982. His testimony appears to be corroborated by N.J.A.C. 11:3-1.3, promulgated by the Commissioner as required under N.J.S.A. 39:6A-10, as well as by the directive of the Commissioner. Neither N.J.A.C. 11:3-7.3 nor the Commissioner's suggested notice or form letter makes any reference specifically to additional income continuation benefits "as long as the disability persists." The Commissioner's suggested letter directs the insurance carriers to enclose an "Offer to Purchase Additional Coverage" for further details of these options, and that "[i]f you desire coverage in excess of those quoted above, inquire directly to your [company] [agent]." The "Offer to Purchase Additional Coverage" form attached to the letter itemizes the five options available in Appendix A of N.J.A.C. 11:3-7.3 but there is no reference to income continuation benefits for "as long as the disability persists."
The regulations in effect prior to December 1982 appear to indicate a transitory period in which there was no requirement for income continuation benefits for "as long as the disability persists." Significantly N.J.A.C. 11:3-7.3(b) required only five weekly indemnity schedules "with a two-year benefit duration." (Emphasis supplied.) Further, N.J.A.C. 11:3-7.3(c) directs that "at least for the initial period, it will be sufficient if your manuals exhibit these minimum benefits schedules with corresponding rates." (Emphasis supplied.) The historical note to subchapter 7 of the regulations pertaining to Automobile Reparation Reform Act, N.J.A.C. 11:3-7.1, states that the provisions of that subchapter became effective December 4, 1972.
The present regulations under N.J.S.A. 11:3-7.4 pertaining to minimum schedule of additional personal injury protection coverage benefits, annexed hereto as Appendix II, became effective August 16, 1982. N.J.A.C. 11:3-7.4(a) provides that: "Every rate filer's schedule of rates for additional personal injury *377 protection benefits shall provide at least the benefit schedules set forth in Table 1 in [subsection] (b) below." The additional PIP coverage table in subsection (b) requires eight options up to $700 per week for total income continuation benefits of $72,800, but, significantly, now requires eight additional options from 9 to 16 for weekly income continuation benefits of $100 to $700 per week with the total income continuation benefits "unlimited." It thus appears that it was not until August 1982 that insurance carriers were required to file a schedule of rates for additional unlimited or "as long as the disability persists" PIP income continuation benefits.
From our review of the record and the regulations and directives of the Commissioner, we are satisfied that plaintiffs have failed to sustain their burden of proof that additional income continuation benefits for "as long as the disability persists" were available prior to December 1982. Moreover, there is nothing in the record before us to indicate that, even if additional continuation benefits were available for "as long as the disability persists," the additional coverage would have been requested. We note that in the renewal policy issued to Mrs. Olivero for the period from February 21, 1986 to February 21, 1987, she still had not elected unlimited coverage. She chose option 6 with weekly benefits of $500 and total benefits of $52,000, but she made no election for option 14 which provides for unlimited income continuation benefits of $500 per week. In absence of any statement from Mrs. Olivero to the contrary, it would be sheer speculation for us to infer that she would have purchased additional income continuation benefits for "as long as the disability persists" had it been offered.

II
Defendants cite Greenberg v. Great American Ins. Co., 158 N.J. Super. 223 (App.Div. 1978), aff'd 79 N.J. 399 (1979) for the proposition that "[t]he measure of income loss referred to in N.J.S.A. 39:6A-4b. is the difference between what one would *378 have earned had the injury not occurred and what one did earn." 158 N.J. Super. at 228. At oral argument before the trial court, plaintiffs indicated that the "reconstructed rate of disability will be somewhere between one hundred and fourteen and one hundred and twenty-four dollars a week."
On appeal before us, they argue that the nature of Tina's injuries "has created a loss of income over what she would have earned as an adult without quadriparesis. Her income loss is, therefore, much greater than the loss of a part-time job." They assert that Tina, therefore, "is entitled to reconstruct what that loss of income is" which results in "a substantial difference between what she earned before the accident and what she will not earn because of her injuries."
The issue presented in Greenberg was whether plaintiff had, or may have had, "loss of income despite the fact that his cash receipts during this period of disability, partial or total, exceed[ed] those he was receiving before the accident." 158 N.J. Super. at 227. We held that income continuation benefits to be paid under the No-Fault Act is measured by the difference between the amount that the claimant would have earned if not injured and the income actually received. Id. at 228. This formula applies to "all income producers, wage earners, those on tips, commissions, royalties, contingent fees and any other sort of income."
The rationale for the measure of loss of income is based upon the proposition that, for e.g., lost commissions or contingent fees during the period of income continuation benefits probably will differ from that offered in support of a claim for loss for a fixed salary per week. Id. An income producer such as a salesman or broker may receive income during the period of disability which was generated prior to the date of the accident. A salaried worker on a fixed income should be permitted to prove any increments he may have received over his fixed salary. Id. at 228.
*379 In Greenberg, we reversed the trial judge who had held that where a claimant's income during a period of disability after an automobile accident exceeded his income before the accident, the claimant's increased income while disabled repelled the notion that he had lost income during the disability period. Id. at 227. Cf. Gambino v. Royal Globe Insurance Co., 86 N.J. 100 (1981) (insured who had always been gainfully employed and who had sold his taxi company and was injured two days before beginning new employment was entitled to income continuation benefits). Under certain conditions, that conclusion may not be valid: A partner may receive income during the period of disability which was generated prior to the date of the accident. By the same token, a claimant may sustain a diminution in income after the disability has been terminated because of his inability to generate income during the time of the disability. See Zyck v. Hartford Insurance Group, 143 N.J. Super. 580 (Law Div. 1976), mod. and aff'd 150 N.J. Super. 431 (1977).
What is more important, Greenberg expressly rejected plaintiffs' contention that Tina is entitled to project her future diminution in earning capacity:
Income continuation benefits provided under the no-fault law do not redress diminished earning capacity, a traditional item of damage in third-party tort cases, but rather indemnify for actual earning loss suffered as a result of a covered automobile accident.
* * * * * * * *
We stress ... that the formula by which earning loss is to be determined measures just that and not diminished earning capacity. The inquiry is, what would the victim have earned had he not been injured. [158 N.J. Super. at 230-231.]
See Zyck v. Hartford Insurance Group, 143 N.J. Super. at 592 (tort damage concepts cannot be applied with equal force under the No-Fault Act).
This conclusion is buttressed by the fact that under N.J.S.A. 39:6A-4b. and 39:6A-10, the maximum total income continuation benefits has a ceiling or cap as to the total amount which may be recovered  $5,200 under the former and $41,600 *380 under option 5 of the latter statute.[5] Moreover, the purpose of the Act is "reparation." N.J.S.A. 39:6A-1. In Webster's New Third International Dictionary at 1923, "reparation" is defined as the act or process of mending or restoring. As stated in Marcos v. Transamerica Insurance Company, 76 N.J. 572, 583 (1978) (Justice Schreiber dissenting):
Indeed, viewing the statute in its entirety, one discerns a pattern of reimbursement, whether for medical expenses, funeral expenses, loss of income, or essential service benefits. The intent certainly was not to provide someone with a windfall, a result which conflicts with another major purpose of the no fault law  to decrease the cost of automobile liability insurance to the motoring public. M. Iavicoli, [No-Fault & Comparative Negligence in New Jersey (1973)] at 20. Reimbursement and reparations are the keys to the legislative intent. [Emphasis supplied.]
The purpose of the No-Fault Act is incompatible with plaintiffs' contention that income continuation benefits may be projected to anticipate future loss of income because of a diminution in earning capacity under principles for damages in tort actions.

III
Based upon the premise that the workers' compensation award for permanent disability does not constitute a weekly income, plaintiffs contend that Tina "is entitled to the payment of income continuation benefits from the date that she is declared permanently disabled by the Workers' Compensation Court." They submit that an award for a permanent disability does not constitute wage benefits and that PIP benefits are payable after the temporary disability benefits from the workers' compensation termination, citing Skryha v. Pennsylvania Nat. Mut. Cas., 206 N.J. Super. 66 (App.Div. 1985). They argued before the trial court that "when they [workers' compensation] don't supply a benefit, then you can go back to PIP and get it."
*381 There is no doubt that an award for permanent disability under the Workers' Compensation Act represents compensation for the employee's physical impairment to carry on the ordinary pursuits of life and not loss of income, Perez v. Pantasote, Inc., 95 N.J. 105, 111 (1984); accord Young v. Western Electric Co., Inc., 96 N.J. 220, 226 (1984). Nevertheless, Skryha does not support plaintiffs' contention that PIP income continuation benefits up to the maximum coverage commence after the workers' temporary disability benefits terminate.
In Skryha, the plaintiff was attempting to collect for essential service benefits which were not collectible under workers' compensation insurance and therefore was not barred from recovery under PIP coverage by the workers' survivor. Id. at 71. On the other hand, Skryha denied plaintiff's application for funeral expenses up to $1,000 pursuant to N.J.S.A. 39:6A-4(e) because plaintiff had already recovered $2,000 for funeral benefits under workers' compensation. This is because N.J.S.A. 39:6A-6 requires benefits collectible under workers' compensation insurance to be deducted from the benefits collectible under N.J.S.A. 39:6A-4 and 10. Id. As stated in Aetna Insurance Co. v. Gilcrest Bros., Inc., 85 N.J. 550, 566 (1981):
When the Legislature desired to modify the impact of having the automobile liability insurance company pay PIP benefits, it has done so in unmistakable fashion. Thus the Legislature has expressly provided that PIP payments shall be reduced by the amount of workers' compensation benefits collectible under the Workers' Compensation Act. N.J.S.A. 39:6A-6. In that event, the automobile liability carrier will receive the benefit of workers' compensation because of the express legislative intent. [Emphasis supplied.]
Income continuation benefits under the No-Fault Act and temporary disability payments under the Workers' Compensation Act are co-extensive. No-fault continuation benefits do not supplement workers' compensation benefits except insofar as the No-Fault Act provides more benefits than those provided under the Workers' Compensation Act. See Wagner v. Transamerica Insurance Company, 167 N.J. Super. 25, 34 (App.Div. 1979). ("N.J.S.A. 39:6A-6, in requiring the deduction of collectible PIP benefits, is a clear legislative mandate that workers' *382 compensation should be the ultimate source for recovery of the medical expenses of claimants injured in compensable auto accidents.") See Olivero by Olivero v. New Jersey Mfrs. Ins. Co., 199 N.J. Super. at 198.
Although PIP benefits are "payable as loss accrues", N.J.S.A. 39:6A-6, and commence on the date of the accident, Virden v. Travelers Insurance Company, 167 N.J. Super. 209, 210 (1979), in the present case NJM had no obligation to pay income continuation benefits as long as temporary benefits equal to or more than the income continuation benefits were paid by Liberty Mutual, the workers' compensation carrier.
We are convinced that where temporary disability payments under the Workers' Compensation Act are in excess of income continuation benefits under the No-Fault Act and the disability continues beyond a period of the workers' compensation benefits, a claimant is entitled to receive income continuation benefits under the No-Fault Act for as long as the disability persists until the maximum benefits have been paid. However, the PIP insurance carrier is entitled to a credit under N.J.S.A. 39:6A-6 for the workers' compensation benefits paid during the period of disability.
If NJM had paid the PIP income continuation benefits in the amount of $29 per week in the first instance, it would have been subrogated to Tina's right to workers' compensation benefits and would have been fully reimbursed for the PIP benefits it had paid.
Stated another way, had there been no workers' compensation benefits payable to Tina, under N.J.S.A. 39:6A-4 and 10 the maximum benefits which she could have collected would be at the rate of $29 per week up to the basic amount of $5,200 with the "excess between $5,200.00 and the amount of coverage contracted for [$36,400] ... on the basis of 75% of said difference," N.J.S.A. 39:6A-10. The additional benefits amount to $27,300 for total PIP income continuation benefits of $32,500. Although she has in fact received 340 weeks of temporary *383 disability payments at $53.07 per week, NJM would have been obligated to pay a total of $8,701.75 for PIP wage income continuation benefits during the 340 weeks of payments by the workers' compensation carrier, Liberty Mutual.[6] Deducting these benefits from the total additional benefits of $32,500, NJM is obligated to pay the balance in the amount of $23,758.25 in weekly installments of $21.75 until the full balance of income continuation benefits is paid. Cf. Smith v. Allstate Ins. Co., 203 N.J. Super. 610 (Law Div. 1985) (insured, who had received temporary disability benefits, but whose disability continued beyond the period of temporary disability benefits, held entitled to receive additional income continuation benefits under PIP for as long as the disability persisted, until the maximum PIP benefits have been paid and temporary disability benefits were not to be deducted from maximum coverage) and see Zoller v. Transamerica Ins. Co., 215 N.J. Super. 552 (App.Div. 1987) (no income continuation benefits under PIP where plaintiff returned to work one month after accident then took early retirement 15 months later with no medical testimony that this disability required retirement).
The order of April 1, 1987 granting defendant's motion for summary judgment and dismissing plaintiffs' complaint is reversed and the matter is remanded to the trial court for entry of judgment consistent with this opinion.

*384 APPENDIX I

Minimum schedule of additional personal injury protection
(a) Appendix A outlines the minimum schedule of "additional personal injury protection" coverage benefits that insurers must make available in accordance with Section 10 of the Act.
(b) In the Appendix A table, only five weekly indemnity schedules are shown, with a two-year benefit duration. It is believed that these ranges of benefits will meet the demand for this additional coverage in most cases.
(c) Consequently, at least for the initial period, it will be sufficient if your manuals exhibit these minimum benefit schedules with corresponding rates.
(d) However, benefits in excess of those set forth in Appendix A must be made available at the option of the named insured at reasonable intervals subject to the specific approval by the Commissioner, up to a maximum additional weekly loss of income benefit of $35,000 per year, as well as reasonable essential service benefits, survivor benefits and funeral expense benefits, as required by Section 10 of the Act.

APPENDIX A

ADDITIONAL PERSONAL INJURY PROTECTION

 Maximum Additional
 Weekly Maximum Additional
 Loss of Income Benefit Essential Services
 During After
 Period of Period of
 Basic Basic Total
 Benefits Benefits Maximum During After Total Death
 Payments Payments Income Basic Basic Max. E. Benefits
 (a) (b) Benefits Payments Payments Serv. (c)
 1. $0 $100 $ 5,200 $0 $12 $ 4,380 $10,000
 2. 25 125 7,800 8 20 10,220 10,000
 3. 75 175 13,000 8 20 10,220 10,000
 4. 150 250 20,800 8 20 10,220 10,000
 5. 300 400 36,400 8 20 10,220 10,000
 NOTES TO TABLE
 (a) Subject to 75 per cent of the
 amount of weekly income in excess GENERAL: Above schedules applicable
 of $100.00 per week. to named insured as defined;
 limits apply per person,
 (b) Subject to 75 per cent of the per accident.
 total weekly income.
 (c) Death benefit shall be payable Broader forms of additional personal
 provided death occurs within 90 injury protection benefits
 days from date of accident. are available on a "refer to company"
 basis.
 Nothing herein is intended to
 prohibit the marketing of additional
 coverage on a per car basis.
 [N.J.A.C. 11:3-7.3]

*385 APPENDIX II

11:3-7.4 Minimum schedule of additional personal injury protection coverage benefits
(a) Every rate filer's schedule of rates for additional personal injury protection benefits shall provide at least the benefit schedules set forth in Table 1 in (b) below.
(b) The additional personal injury protection coverage table follows:

 Table 1
 Income Essential Services Funeral
Option Weekly Total Per Day Total Death Expense
 1 $100 $10,400 $12 $ 8,760 $10,000 $2,000
 2 125 13,000 20 14,600 10,000 2,000
 3 175 18,200 20 14,600 10,000 2,000
 4 250 26,000 20 14,600 10,000 2,000
 5 400 41,600 20 14,600 10,000 2,000
 6 500 52,000 20 14,600 10,000 2,000
 7 600 62,400 20 14,600 10,000 2,000
 8 700 72,800 20 14,600 10,000 2,000
 9 100 unlimited 12 8,760 10,000 2,000
 10 125 unlimited 20 14,600 10,000 2,000
 11 175 unlimited 20 14,600 10,000 2,000
 12 250 unlimited 20 14,600 10,000 2,000
 13 400 unlimited 20 14,600 10,000 2,000
 14 500 unlimited 20 14,600 10,000 2,000
 15 600 unlimited 20 14,600 10,000 2,000
 16 700 unlimited 20 14,600 10,000 2,000

11:3-7.5 Notice requirements
(a) Additional personal injury protection benefits shall be offered by the insurer at least annually on a form prescribed by the Commissioner of Insurance.
1. The buyer's guide and coverage selection form specified at N.J.S.A. 39:6A-23 and any rules promulgated thereunder shall meet the requirements of (a) above.
(b) Insurers shall provide written notice advising policyholders of the change effected by the enactment of P.L. 1985, c. 520, section 16 in all applications for an automobile insurance policy and notices of renewal of an automobile insurance policy that are issued on or after the effective date of this subchapter.
1. The buyer's guide specified at N.J.S.A. 39:6A-23 and any rules promulgated thereunder shall meet the requirements of (b) above.
(c) Each insurer shall distribute copies of this subchapter to every person responsible for the handling and settlement of claims subject to this subchapter. Every insurer shall satisfy itself that all such responsible persons are thoroughly conversant with and are complying with this subchapter.
NOTES
[1] Actually two orders were entered, the other is dated March 27, 1987; we have considered both of them.
[2] We note that 340 weeks temporary disability at $53.07 totals $18,043.80 and assume there were adjustments on the allowance for temporary disability.
[3] Pursuant to L. 1981, c. 533, this section was amended to provide, among other things, that "regardless of the duration of the disability, the benefits payable shall not exceed the total maximum amount of income continuation benefits contracted for."
[4] Although plaintiffs' assert that "there is no evidence that plaintiff's mother ever received the form" there is nothing in the record before us to indicate that she did not receive the form. On the contrary it appears that notices were received but the plaintiffs complain that the notice "did not include the required section 10 option for income continuation benefits for the length of the disability...."
[5] As previously noted, N.J.A.C. 11:3-7.4(b) presently provides for 16 options for income continuation benefits ranging from $100 per week to $700 per week. Commencing with option 9 to option 16, the total ceiling is now "unlimited."
[6] NJM is entitled to credit only for the amount of its obligation under the No-Fault Act and may not take credit for the elevated payments of $53 per week under the Workers' Compensation Act. At $29 per week for 179 weeks ($5,200 divided by $29) plus $21.75 per week ($29 times 75%) for the remainder of 161 weeks, NJM would have had to pay a total of $8,701.75 under its PIP income continuation benefits.